**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

HEATHER MERRILL,

                              Plaintiff,                    3:19-cv-1240 (BKS/ML)

v.

CORRINE L. COPELAND,

                              Defendant.

_____

**Appearances:**

_For Plaintiff:_
Jonathan R. Goldman
Sussman & Associates
1 Railroad Avenue, Suite 3
P.O. Box 1005
Goshen, New York 10924

_For Defendant:_
Meredith A. Moriarty
Smith Hoke, PLLC
16 Wade Road
Latham, New York 12110

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

This action arises from an October 17, 2017 incident during which Plaintiff Heather

Merrill was arrested after Defendant Corrine Copeland reported that she had found Plaintiff in a

sexual situation with a minor. In the complaint, Plaintiff brought this action under 42 U.S.C.

§ 1983, alleging that Defendant subjected her to false arrest and malicious prosecution in

violation of her Fourth Amendment rights. (Dkt. No. 1). Defendant moves for summary

judgment under Federal Rule of Civil Procedure 56 as to both of Plaintiff's claims. (Dkt. No.

76). The parties have filed responsive briefing. (Dkt. Nos. 80, 86, 87). For the following reasons, Defendant's motion is granted.

## II.      FACTS[1]

### A.      The Youth Leadership Academy

At all relevant times, Defendant and Plaintiff were employed by the New York State Office of Family and Children Services at the Youth Leadership Academy ("YLA") in South Kortright, New York. (Dkt. No. 76-1, ¶¶ 1–2; Dkt. No. 80-1, ¶¶ 1–2; Dkt. No. 76-9, at 9–13). The YLA is a "state-funded facility that houses youthful offenders or at-risk youth." (Dkt. No. 76-6, ¶ 2). Defendant worked as a Youth Counselor, and her duties included supervising the residents at the facility as well as supervising staff known as Youth Division Aides ("YDAs"). (Dkt. No. 76-1, ¶¶ 2–3; Dkt. No. 80-1, ¶¶ 2–3; Dkt. No. 76-8, at 20). Defendant at times was also the designated "Administrator-on Duty," who was "essentially in charge" of other administrators at the YLA. (Dkt. No. 76-1, ¶ 3; Dkt. No. 80-1, ¶ 3; Dkt. No. 76-8, at 28). Plaintiff, who was 27 years old at the relevant time, worked as a YDA. (Dkt. No. 76-9, at 9–13, 142).

All YLA employees are trained in how to safely deal with residents who present a danger to themselves or others, including restraint training, how to escape from a resident, and de-escalation training. (Dkt. No. 76-1, ¶ 67; Dkt. No. 80-1, ¶ 67; Dkt. No. 76-9, at 18–19). Employees are also trained on using their radios to call for help, reporting any incidents of abuse, and the procedures and processes to follow if they have been assaulted. (Dkt. No. 76-1, ¶¶ 68–71; Dkt. No. 80-1, ¶¶ 68–71). YLA employees are mandatory reporters under state law, requiring

---

[1] The facts are drawn from Defendant's Statement of Material Facts, Plaintiff's Counterstatement of Material Facts, and the parties' respective responses, (Dkt. Nos. 76-1, 80-1, 86-1), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

them to report anything they witness that they perceive as abuse against a minor. (Dkt. No. 76-9, at 141); *see* N.Y. Soc. Serv. Law § 413.

### B.      Events Preceding October 17, 2017

In early October 2017, Plaintiff was directed to take residents "for gym class across the road to a field where they were going to play kickball." (Dkt. No. 76-9, at 48). Because there were no cameras at the field, an administrator was required to accompany Plaintiff and the residents for safety reasons. (*Id.*; *see also* Dkt. No. 80-6, ¶ 6). According to Plaintiff, none of the three administrators on duty that day, including Defendant, came to the field. (Dkt. No. 76-9, at 48). Plaintiff reported the rule violation to two youth counselors and filed a written grievance. (*Id.* at 48–49). Although Plaintiff states in her declaration that she "understand[s] that [Defendant's] supervisors later [] spoke to her about this" and "admonished her" for violating policy, (Dkt. No. 80-6, ¶ 6), Defendant denies that Plaintiff ever made a report against her or that she was admonished. (Dkt. No. 76-8, at 44–45; *see also* Dkt. No. 76-6, ¶¶ 4–5 (YLA Assistant Director Robert Paoletti declaring: "I do not believe that Ms. Copeland had any disciplinary problems" and "I do not remember Ms. Merrill ever making a verbal or written complaint against Ms. Copeland, nor reporting her for any infractions"), Dkt. No. 76-7, ¶ 7 (YLA Director Bernard Smith declaring that he does not recall Defendant ever being disciplined for a major infraction or Plaintiff "ever reporting on" Defendant)).

As a YDA, Plaintiff had taken J.C. and G.H.,[2] two male residents, several times to clean areas of the YLA together, something that residents often did. (Dkt. No. 76-1, ¶ 47; Dkt. No. 80-1, ¶ 47; Dkt. No. 76-9, at 41–44, 63–64). On October 16, 2017, Plaintiff took J.C., who was 16 years old at the time, and G.H. to clean Activity Room 4, a multipurpose room that contains "a

---

[2] J.C. and G.H., who were minors at the time of the relevant events, are referred to in court filings by their initials.

short dividing wall, sinks, and bathroom stalls." (Dkt. No. 76-1, ¶ 5; Dkt. No. 80-1, ¶ 5; Dkt. No.

76-8, at 69). Activity Room 4 is a "large open room" with a bathroom at one end which is only

separated from the rest of the room "by a row of sinks behind a half-wall partition." (Dkt. No.

80-6, ¶ 13; Dkt. No. 86-1, ¶ 20). Both J.C. and G.H. would later report to law enforcement that

J.C. and Plaintiff had sex in Activity Room 4 that night. (Dkt. No. 76-10, at 3, 5; Dkt. No. 76-11,

at 3). Plaintiff denies that anything physical happened between her and J.C. on October 16. (Dkt.

No. 76-9, at 69–70).

### C.     The October 17, 2017 Incident and Plaintiff's Arrest

#### 1.     The Incident

The parties have conflicting accounts of what happened on October 17, 2017. According

to Plaintiff, early in her 2:00 p.m. to 10:00 p.m. shift, Defendant approached Plaintiff, appearing

agitated, and asked her if she had "problems" or "issues" with Defendant. (Dkt. No. 76-9, at 46–

47, 136, 138–39; *see also* Dkt. No. 80-6, ¶ 7). Plaintiff responded that she had no problems with

Defendant and that Plaintiff was "there to do [her] job." (Dkt. No. 76-9, at 47). Defendant denies

ever having a conversation with Plaintiff in which she confronted Plaintiff and asked if Plaintiff

had any problems with her. (Dkt. No. 76-8, at 45).

The parties agree that Defendant was the Administrator-on-Duty at the YLA on October

17. (Dkt. No. 76-1, ¶ 4; Dkt. No. 80-1, ¶ 4). They also agree that J.C. and G.H. were in Plaintiff's

charge on that day. (Dkt. No. 76-1, ¶ 7; Dkt. No. 80-1, ¶ 7). While the parties do not dispute that

Plaintiff took J.C. and G.H. to clean Activity Room 4 that evening, they do dispute who

requested such cleaning. According to Plaintiff, Defendant called Plaintiff's unit at

approximately 8:45 p.m. and requested that Plaintiff take J.C. and G.H. to clean the Activity

Room 4 bathrooms, which Defendant said were dirty. (Dkt. No. 76-9, at 70–71; Dkt. No. 80-6,

¶ 9). Plaintiff states that while it was "common for residents to go clean different areas of the

facility," it was "not common to do so this late in the evening after the final count of the day." (Dkt. No. 80-6, ¶ 10). According to Defendant, however, J.C. approached her at some point to ask to clean the facility, and Plaintiff later called Defendant requesting to take J.C. and G.H. to clean the bathrooms. (Dkt. No. 76-8, at 67, 71, 75). Defendant also states that it was typical for residents to do a cleaning assignment after the 9:00 p.m. count. (*Id.* at 74).

After the evening count was completed, Plaintiff took J.C. and G.H. to clean the Activity Room 4 bathroom. (Dkt. No. 80-6, ¶ 11). Plaintiff followed facility protocol and reported her movement to the Central Services Unit ("CSU") and had another staff member record her movement in the housing unit logbook. (*Id.*). On the way, Plaintiff and the two residents met Mr. Liberi, a youth counselor. (*Id.* ¶ 12). Mr. Liberi took G.H. to the medical unit for G.H.'s evening medications while Plaintiff took J.C. to a supply area to gather cleaning supplies. (*Id.*). All four individuals arrived at Activity Room 4 at approximately the same time; Mr. Liberi then left, and J.C. and G.H. began to clean. (*Id.*). Plaintiff states that she reminded J.C. and G.H. to clean thoroughly because Defendant had indicated that the bathroom was filthy. (Dkt. No. 80-6, ¶ 14).

According to Plaintiff, J.C. asked her to hand him a cleaning spray bottle. (Dkt. No. 76-9, at 79). As Plaintiff approached the bathroom stall to hand him the spray, J.C. pushed her into the bathroom stall and entered the stall behind her such that J.C. was between Plaintiff and the stall door. (*Id.*). Plaintiff began to struggle and attempt to exit the stall, but J.C. was able to overpower her and push her toward the wall. (*Id.* at 79–80; Dkt. No. 80-6, ¶ 14). J.C. unbuttoned Plaintiff's pants and pulled them down, and he was unable to unbuckle Plaintiff's utility belt, which fell to the floor. (Dkt. No. 76-9, at 80–82).[3] J.C. touched Plaintiff's vagina with his penis from behind

---

[3] The utility belt, which was part of employees' uniforms and held their radio and keys, was made of a hard material. (Dkt. No. 76-1, ¶ 18; Dkt. No. 80-1, ¶ 18). According to New York State Police Investigator Brian Mackey, removing the belt involved undoing "several snaps and tak[ing] off a center piece," requiring "effort and knowledge." (Dkt. No.

but did not penetrate her. (*Id.* at 83; Dkt. No. 80-6, ¶ 14). Plaintiff told J.C. to stop and tried to

exit the stall, but she did not scream. (Dkt. No. 76-9, at 84). Plaintiff did not use her radio to call

for help. (*See id.* at 85 (Plaintiff testifying that she was unable to reach get to her radio, which

was on the floor)). Plaintiff estimates that she was in the bathroom stall with J.C. for

approximately five minutes. (*Id.*; Dkt. No. 80-6, ¶ 15).

      In the meantime, Defendant was doing her regular tasks for the evening, which included

checking on residents and staff and walking around the facility. (Dkt. No. 76-8, at 75–76).

Defendant walked through the hallway in front of Activity Room 4. (*Id.* at 76). When she entered

the room, G.H.'s eyes widened, and the parties agree that he said something. (*Id.* at 76–79

(Defendant testifying that G.H. said her name ("Copeland") to "alert" J.C. and Plaintiff that she

was there); Dkt. No. 76-9, at 86 (Plaintiff testifying that G.H. said "yo")). According to Plaintiff,

when G.H. called out J.C. said "oh shit" and paused for a moment, giving Plaintiff the

opportunity to try to push past him. (Dkt. No. 80-6, ¶ 15). Defendant looked toward the

bathroom stalls and saw two sets of feet in one stall. (Dkt. No. 76-8, at 81). She opened the door

to the bathroom stall and saw J.C. and Plaintiff standing facing each other, J.C.'s erect penis, that

J.C.'s pants were down, and that Plaintiff's shirt was untucked. (*Id.* at 81–82).[4]

      The parties sharply dispute what was said once Defendant opened the stall door.

Defendant testified that she said "Merrill, I thought you . . . said that you were cleaning up?"

(Dkt. No. 76-8, at 84). Plaintiff "turned beet red" and repeatedly asked Defendant not to say

---

76-5, ¶ 29). According to Plaintiff, the belt had two plastic ends and clasped by sliding one end into the other, and removing the belt was easy. (Dkt. No. 76-9, at 54; Dkt. No. 80-6, ¶ 4).

[4] Plaintiff acknowledges that both her and J.C.'s pants were down when Defendant opened the stall door. (Dkt. No. 76-9, at 86–87). Plaintiff has never claimed that Defendant witnessed J.C. attacking or assaulting her in any way, and the Court therefore does not credit language in Plaintiff's opposition suggesting that she did. (*E.g.*, Dkt. No. 80, at 16 (suggesting that Defendant "witness[ed] J.C. assaulting" Plaintiff), 25 (suggesting that Defendant "observed that [Plaintiff] was the victim")).

anything. (*Id.* at 85–87). Defendant also testified that she told J.C. to pull up his pants and told J.C. and Plaintiff to exit the stall. (*Id.* at 86). Plaintiff, by contrast, testified at her deposition that Defendant said "I got you" when she opened the stall door. (Dkt. No. 76-9, at 87). Plaintiff also testified that she asked Defendant for help, told her that J.C. was attacking her, and begged her not to leave. (*Id.* at 87–88). Plaintiff remembers saying that she "was trying to show [J.C.] how to clean the bathrooms when he came up behind me." (*Id.* at 145). Defendant denies that Plaintiff asked for help or told Defendant that J.C. had attacked her. (Dkt. No. 76-8, at 85).[5] According to Defendant, there were no cleaning supplies in the bathroom stall. (Dkt. No. 76-8, at 130–31). Plaintiff responds that the surveillance video, which does not capture inside the bathroom stalls, depicts Plaintiff, J.C., and G.H. bringing cleaning supplies "into the stall area" and that she was bringing J.C. a spray bottle when he pushed her into the stall. (Dkt. No. 80-1, ¶ 16).

The parties agree that Defendant was only in the bathroom for a short period of time. (Dkt. No. 76-1, ¶ 17; Dkt. No. 80-1, ¶ 17). Defendant left to find Mr. Liberi, another youth counselor. (Dkt. No. 76-8, at 86). Defendant could not recall at her deposition exactly what she told Mr. Liberi, but she directed him to Activity Room 4. (*Id.* at 87–88, 99; *see also* Dkt. No. 76-14, at 85 (Defendant testifying at Plaintiff's criminal trial that she "sent Mr. Liberi up there")).[6] Plaintiff states that she was in "complete shock." (Dkt. No. 80-6, ¶ 16). J.C. sat on the floor saying that his "life was over" and that he would lose his release date as a result of the incident. (*Id.*; Dkt. No. 76-9, at 88). Plaintiff did not leave the residents or use her radio to call for help. (Dkt. No. 76-9, at 89, 124). She "clicked into the motions" of her job, which requires that

---

[5] At her criminal trial, Plaintiff testified that she did *not* tell Defendant that she was forced into the bathroom, that she was hurt, or "anything about what happened." (Dkt. No. 76-14, at 156–57).

[6] Defendant reacted emotionally to what she saw in the bathroom stall. (*See* Dkt. No. 76-8, at 86, 88). Defendant has subsequently admitted that she should not have left Plaintiff and J.C. alone, and she was written up for doing so. (*Id.* at 99–102).

"you're not supposed to leave any resident alone ever." (*Id.* at 90). Plaintiff told J.C. and G.H. to put the cleaning supplies away; she wanted to get them back to their housing unit quickly so she "could get away from them." (*Id.* at 91). As the three exited Activity Room 4, they met Mr. Liberi in the hallway. (Dkt. No. 80-6, ¶ 16). Plaintiff states that she told Mr. Liberi that she needed to talk to him; Mr. Liberi responded that Plaintiff should go to the pre-shift briefing room and he would take J.C. and G.H. back to their unit. (Dkt. No. 76-9, at 92).

## 2. Defendant's Reports

After speaking with Mr. Liberi, Defendant went to CSU to call her superiors. (Dkt. No. 76-8, at 89). Defendant called—or had CSU staff call on her behalf—Assistant Director Paoletti, who was the administrator on call that night. (*Id.*; Dkt. No. 76-6, ¶ 7 (Paoletti declaration stating that Defendant called him and said "she saw [Plaintiff] having sex with one of the youth residents")). Assistant Director Paoletti directed Defendant to call Director Smith, who lived closer to the facility. (Dkt. No. 76-6, ¶ 7). Defendant called Director Smith, who states that Defendant told him "she saw [Plaintiff] coming out from the area where the bathroom was located," with her "duty belt off" and her hair "disheveled." (Dkt. No. 76-7, ¶ 8). Director Smith directed Defendant to ensure J.C. was taken to the nurse and later to the emergency room. (Dkt. No. 76-8, at 107–08).[7] After arriving at the YLA, speaking with Defendant, and reviewing surveillance video, Director Smith reported the incident to the New York State Police and the Justice Center. (Dkt. No. 76-7, ¶¶ 9–10; *see also* Dkt. No. 76-5, ¶ 3 (declaration of Investigator Mackey stating that the State Police "first received a call from Bernard Smith" reporting that Plaintiff "was found in a sexual position with a minor resident in her care")). Defendant could

---

[7] Defendant later took J.C. to the emergency room, after she had spoken with police. (Dkt. No. 76-8, at 110–11, 121–22).

not recall at her deposition whether she also called these entities, but testified that she would have done so had she been directed to by her supervisors. (*See* Dkt. No. 76-8, at 92–99; *see also* Dkt. No. 76-14, at 85 (Defendant testifying at Plaintiff's criminal trial that she called the police and the Justice Center)).

Two State Troopers, Officers Konstable and Radley, arrived at the YLA and interviewed the relevant parties, including Defendant, and reviewed the surveillance video. (Dkt. No. 76-5, ¶¶ 5–6). Defendant spoke with the Officers and signed a supporting deposition before a Trooper Langtry shortly after 11:00 p.m. (Dkt. No. 76-8, at 111–14, 117). The deposition indicates that the interview started at 11:07 p.m. and ended at 11:33 p.m. (Dkt. No. 76-10, at 2). In relevant part, Defendant's supporting deposition reads that, after she entered Activity Room 4 and G.H. called out:

> I immediately looked down and saw [J.C.'s] and [Plaintiff's] feet facing each other inside the bathroom stall. Once I saw their feet I immediately ran to the stall and pushed open[] the door. Once I opened the door I observed [J.C.] with his pants down and his erect penis out. [Plaintiff] had her belt off and jacket off. Her hair was dish[e]veled and her face was be[e]t red. When I asked them what they were doing in there [Plaintiff] responded, "I was teaching him how to clean the toilet." There were absolutely no cleaning supplies in the stall. J.C. stated to me that he "finger popped" her three times. He also stated to me, "I stuck my dick in her two or three times before you came in." [J.C.] advised me that [Plaintiff] coerced him to have sex.

(*Id.*).

### 3.     Other Reports to Law Enforcement

J.C. and G.H. were interviewed by the police separately and signed supporting

depositions giving similar descriptions of the incident. (Dkt. No. 76-5, ¶ 9; Dkt. No. 76-10, at 3,

5).[8] J.C.'s supporting deposition, signed at 11:07 p.m., states in relevant part:

> Once we were inside the AR4 room I grabbed [Plaintiff's] ass.
> [Plaintiff] smiled once I grabbed her. This was planned from
> yesterday . . . . We also had sex yesterday October 16, 2017 around
> 7:00pm in the same AR4 area. After I grabbed her ass, [Plaintiff]
> walked into the bathroom stall and pulled her pants down. I then
> pulled my pants down and we began to have sex in the bathroom
> stall. . . . Approximately 15 minutes go by before we get caught by
> [Defendant]. [Defendant] asked what was going on and I responded
> with "damn." [Plaintiff] said that nothing was going on and we were
> separated.

(Dkt. No. 76-10, at 3). G.H.'s supporting deposition, signed at 11:52 p.m., reads in part:

> Once we got over [to Activity Room 4] [Plaintiff] and [J.C.] went
> into the stall to have sex. Before they went into the stall I told [J.C.]
> I'll be the lookout for them in case anyone comes in. I knew they
> were going to have sex because they did last night too when we came
> over to clean. Tonight they were in the stall for approximately ten
> minutes before [Defendant] came in. Once I saw [Defendant] come
> in I yelled to them . . . . [Defendant] ran to the door and pushed it
> open. I heard [Plaintiff] try to tell [Defendant] she was only showing
> [J.C.] how to clean the toilet. I know that's a lie because they did not
> have any cleaning supplies with them.

(*Id.* at 5).

At 3:40 a.m. in the morning, J.C. participated in an interview with Investigator Michelle

Marshall of the New York State Police. (Dkt. No. 76-11). In this interview, J.C. stated that he

was caught by Defendant having sex with Plaintiff in Activity Room 4. (*Id.* at 3). He stated that

Plaintiff grabbed his hand and led him to the bathroom stall, they both pulled their pants down,

---

[8] Plaintiff disputes Defendant's statement that J.C. and G.H. had been "immediately separated by staff," (Dkt. No. 76-1, ¶ 38), as they were left in Activity Room 4 with Plaintiff and then accompanied back to their housing unit by Mr. Liberi.

Plaintiff performed oral sex on him, and they then "got busy." (*Id.*). J.C. stated that he "finger popped" Plaintiff while they were in the bathroom stall. (*Id.* at 4). J.C. also recounted that he and Plaintiff had sex the evening of October 16. (*Id.* at 3). J.C. stated that Plaintiff had brought him drugs on two occasions: one pill of Oxycodone 5 on October 16 and one pill the prior week. (*Id.* at 4). Plaintiff also gave him a "pair of gray panties with pink imprint that said 'I want candy,'" which J.C. returned to her after having sex on October 16. (*Id.*).[9]

### 4.    Plaintiff's Arrest

After meeting Mr. Liberi in the hallway after the incident, Plaintiff went to the pre-shift briefing room and waited there. (Dkt. No. 76-9, at 114, 133). Plaintiff did not witness anything J.C. said to law enforcement or have any other contact with him that night. (*Id.* at 133).

Plaintiff testified at her deposition that a few YLA staff members came into the briefing room at approximately 9:45 p.m., before the start of their shift, and that she "told them what had happened." (*Id.* at 93).[10] She also testified that a Mr. Howland came into to take her radio; Plaintiff tried to tell him what happened but he "cut [her] off" and said someone would come to talk to her. (*Id.* at 94). According to Plaintiff, Defendant also came into the room to tell Plaintiff that the police would be coming. (*Id.* at 95). Plaintiff tried to tell her what happened but Defendant also cut her off. (*Id.*). Defendant denies that she ever went into the briefing room to see Plaintiff that night. (Dkt. No. 76-8, at 109).

---

[9] According to Investigator Mackey, the State Police's investigation "revealed that several days prior to the incident, counselors Vincent Baker and Teddy Watson had confiscated a pair of women's underwear from JC's room. Mr. Baker returned the underwear to JC without any disciplinary consequences." (Dkt. No. 76-5, ¶ 22). In a supporting deposition, Mr. Baker stated that he conducted a room search on October 13 and "did not find any contraband" in J.C.'s room. (Dkt. No. 76-10, at 6). Mr. Baker was "terminated for lying during the investigation." (Dkt. No. 76-6, ¶ 16). Plaintiff denies ever giving any underwear to J.C. (Dkt. No. 80-6, ¶ 19).

[10] As Defendant points out, however, Plaintiff testified at her criminal trial that only Mr. Howland, Defendant, and a police officer came into the room while she was there. (Dkt. No. 76-14, at 141–43).

Although Investigator Mackey states that officers at the YLA interviewed Plaintiff, who gave very little information and did not claim to have been sexually assaulted, (Dkt. No. 76-5, ¶ 8), Plaintiff denies being interviewed at the YLA, (Dkt. No. 80-6, ¶¶ 17–18; *see also* Dkt. No. 80-4, at 8).

Around midnight, Director Smith entered the briefing room but states that he "did not ask [Plaintiff] about what happened, as [he] did not want to interfere with the investigation." (Dkt. No. 76-7, ¶ 11). Director Smith states that Plaintiff "never reported to [him] that she had been raped," despite her training to report such incidents. (*Id.* ¶¶ 12–13). Director Smith was accompanied by a State Trooper who placed Plaintiff under arrest and handcuffed her. (Dkt. No. 76-9, at 96–97). According to Investigator Mackey, the Troopers who arrived at the YLA reported their findings to him at his home after they had conducted interviews and reviewed the surveillance footage. (Dkt. No. 76-5, ¶ 11). Based on their report, Investigator Mackey "instructed them to arrest" Plaintiff. (*Id.* ¶ 12).

Upon her arrest, Plaintiff was placed into a State Police vehicle and driven to the State Trooper barracks in Stamford, New York, approximately 15 minutes away. (Dkt. No. 76-9, at 97–98). During the drive, after being read her Miranda rights, Plaintiff asked the Trooper driving her "if anybody was going to ask [her] what happened," and the Trooper responded to wait until they arrived at the barracks. (*Id.* at 98). At the barracks, Plaintiff was interviewed by Investigator Mackey, who also reviewed the surveillance video and found that it corroborated the information provided by Defendant and the residents. (Dkt. No. 76-5, ¶ 13; Dkt. No. 76-9, at 99–100).[11] During this interview, Plaintiff told Investigator Mackey that J.C. had sexually assaulted her.

---

[11] According to Investigator Mackey, the surveillance video depicts Plaintiff emerging from the bathroom stall calmly: "she was not acting like someone who had just been assaulted." (Dkt. No. 76-5, ¶ 19).

(Dkt. No. 76-5, ¶ 14; Dkt. No. 76-9, at 99). According to Plaintiff, Investigator Mackey said she was lying and said "they found [her] underwear in [J.C.'s] room." (Dkt. No. 76-9, at 99–100). According to Investigator Mackey, Plaintiff did not have "adequate answers" to his questions about her account of the incident. (Dkt. No. 76-5, ¶ 15). After a few minutes of questioning, realizing that Investigator Mackey was not going to believe her, Plaintiff asked for a lawyer and terminated the interview. (Dkt. No. 76-9, at 100; Dkt. No. 80-6, ¶ 19).[12]

Plaintiff was subsequently arraigned and able to post bail. (Dkt. No. 80-6, ¶ 20).

### 5. Subsequent Events

On October 18, 2017, YLA employees searched J.C.'s room and found "white powder and pill chunks in a wax paper in his dresser." (Dkt. No. 76-10, at 4 (supporting deposition of Assistant Director Paoletti)). These partial pills "tested positive for oxycodone on the field test." (Dkt. No. 76-5, ¶ 23). A few days later, Plaintiff was arrested on additional charges accusing her of providing J.C. oxycodone. (Dkt. No. 80-6, ¶ 21). The pills were sent to an outside lab for analysis, and the results came back negative or inconclusive for controlled substance content. (Dkt. No. 80-5, at 2 (report stating "No controlled substances were identified.")). The related charges against Plaintiff were dropped. (Dkt. No. 80-6, ¶ 21).

---

[12] Investigator Mackey states that he "found no evidence" that J.C. used force against Plaintiff, noting that Plaintiff's utility belt was "intact" and her "clothes were not torn." (Dkt. No. 76-5, ¶ 29; see also Dkt. No. 76-4, ¶ 21 (District Attorney John Hubbard attesting to the same)). According to Plaintiff, her belt was "damaged slightly." (Dkt. No. 80-6, ¶ 23(d)). While she was able to put the belt back on after the incident, as the surveillance video shows, "it did not hold as tight as before." (Id.; Dkt. No. 76-13).

Investigator Mackey also states that the investigation revealed that Plaintiff had "an unusual pattern of requesting permission to take JC and GH cleaning" and that she had been found "alone [with J.C. and G.H.] in a room with the lights dimmed." (Dkt. No. 76-5, ¶ 20; see Dkt. No. 76-9, at 65–67). The Court does not consider this information with respect to whether there was probable cause to arrest or prosecute Plaintiff because the record does not reflect when this part of the investigation occurred.

### D.   Plaintiff's Prosecution

Investigator Mackey initiated another interview with Defendant after Plaintiff's arrest. (Dkt. No. 76-5, ¶ 31). Defendant testified at her deposition that she would have spoken with any law enforcement individual who reached out to her, but could not recall if or how often that happened. (Dkt. No. 76-8, at 117–19). Defendant did not reach out to Investigator Mackey or ask to speak with him. (*Id.* at 117; Dkt. No. 76-5, ¶ 33 (Investigator Mackey stating that Defendant did not "request any meetings" or "contact our office")). Similarly, during the preparation of Plaintiff's criminal case, the District Attorney's office initiated all contact with Defendant. (Dkt. No. 76-8, at 125).

Defendant testified before a grand jury on March 29, 2018. (*See* Dkt. No. 80-3). The grand jury indicted Plaintiff on two counts of rape in the third degree and one count of endangering the welfare of a child. (Dkt. No. 76-4, ¶ 4). In November 2018, Plaintiff was found not guilty on all three charges after a jury trial. (Dkt. No. 76-9, at 104).

### E.   Justice Center Investigation

The Justice Center, a New York state agency, conducted an investigation into allegations that Plaintiff committed sexual abuse and neglect against a "Service Recipient" on or about October 17, 2017 at the YLA. (Dkt. No. 76-12). The Justice Center interviewed Defendant about the October 17, 2017 incident as part of its investigation. (Dkt. No. 76-8, at 133). Plaintiff declined to participate or answer questions. (Dkt. No. 76-9, at 106–07). On March 12, 2021, the Justice Center issued a "Report of Investigation Determination" in which it found the allegations against Plaintiff "substantiated." (Dkt. No. 76-12, at 2). Although Plaintiff initially pursued an appeal of that finding, she withdrew her appeal on March 1, 2022, before a hearing was held. (Dkt. No. 86-2, at 4).

## III.    STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical

doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.  DISCUSSION

Plaintiff asserts claims for false arrest and malicious prosecution against Defendant under 42 U.S.C. § 1983. (Dkt. No. 1). Plaintiff's claims are premised on Defendant's making five allegedly false statements when reporting what she observed on October 17, 2017. (*See generally id.*; Dkt. No. 14, at 6 (noting that Plaintiff's claims are not premised on Defendant's grand jury or criminal trial testimony)). Specifically, Plaintiff alleged in the complaint that Defendant made the following false statements or omissions: (1) when Defendant opened the stall door and asked what was happening, Plaintiff responded: "I was teaching him how to clean the toilet"; (2) J.C. told Defendant that he "finger popped" Plaintiff "three times" and "stuck [his] dick in her two or three times" before Defendant opened the stall door; (3) J.C. "advised" Defendant that Plaintiff "coerced him to have sex"; (4) failing to report Plaintiff's pleas for assistance; and (5) Plaintiff had begged Defendant not to report the incident and expressed concern over losing her job due to the incident. (*Id.* ¶¶ 7–11, 14).[13] Defendant moves for summary judgment as to both of Plaintiff's claims. (Dkt. No. 76-2).

---

[13] Statements (1) through (3) are found in Defendant's supporting deposition. (Dkt. No. 76-10, at 2). There is no evidence before the Court suggesting that Defendant claimed that Plaintiff had begged her not to report the incident or expressed concern over losing her job, and the parties do not discuss this statement in their briefs. Accordingly, the Court does not address statement (5) further.

## A.      Applicable Law

A Section 1983 claim for false arrest is "substantially the same as a claim for false arrest under New York law." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013). To prevail on a Fourth Amendment false arrest claim, a plaintiff must establish that: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Broughton v. New York*, 37 N.Y.2d 451, 456 (1975)).

A Section 1983 claim for malicious prosecution has four elements: "(1) the initiation or continuation of a criminal proceeding; (2) termination of the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation" for the defendant's actions. *Laureano v. United States*, No. 19-cv-10986, 2020 WL 1847739, at *2, 2020 U.S. Dist. LEXIS 64635, at *4 (S.D.N.Y. Apr. 10, 2020) (citing *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)). In addition, under Section 1983, a plaintiff must allege "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y. City Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000).

## B.      Collateral Estoppel

In her reply memorandum, Defendant argues that Plaintiff's claims are barred by collateral estoppel in light of (1) the Justice Center's determination that the allegations that Plaintiff committed sexual abuse and neglect against a YLA resident were substantiated and (2) Plaintiff's decision not to appeal that determination. (Dkt. No. 86, at 14–18).[14] Defendant argues

---

[14] The Justice Center's report is dated March 12, 2021 and predates Defendant's motion for summary judgment. (*See* Dkt. No. 79-12). However, Plaintiff did not withdraw her appeal of that determination until March 1, 2022, after Defendant's motion was filed. (*See* Dkt. No. 86-2, at 4). Plaintiff submitted a sur-reply to respond to Defendant's preclusion argument. (Dkt. No. 87).

that the Justice Center "already determined that Plaintiff did abuse a minor in her care" and that Plaintiff had a "full and fair opportunity to litigate the issue," which she waived by withdrawing her appeal of the Justice Center's findings. (*See id.*). Plaintiff responds that collateral estoppel does not apply because the issue of whether she abused a minor in her care was never "actually litigated in the Justice Center" and she did not have a full and fair opportunity to litigate the issue. (*See generally* Dkt. No. 87).

Under New York law,[15] collateral estoppel "precludes a party from relitigating an issue which has previously been decided against her in a proceeding in which she had a fair opportunity to fully litigate the point." *In re Dunn*, 24 N.Y.3d 699, 704 (2015) (brackets, citation, and internal quotation marks omitted). Application of collateral estoppel is appropriate when:

> (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and decided, (3) there was a full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.

*Conason v. Megan Holding, LLC*, 25 N.Y.3d 1, 17 (2015) (citations omitted). The issue must also "be decisive of the present action." *Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003) (citation omitted). The party seeking to invoke collateral estoppel has the burden of showing "the identity of the issues," while the party seeking to avoid application of the doctrine "must establish the lack of a full and fair opportunity to litigate" the issue. *Dunn*, 24 N.Y.3d at 704. Collateral estoppel "is a flexible doctrine which can never be rigidly or mechanically applied." *Gilberg v. Barbieri*, 53 N.Y.2d 285, 292 (1981) (citations omitted).

---

[15] "A federal court must apply the collateral estoppel rules of the state that rendered a prior judgment on the same issues currently before the court." *LaFleur v. Whitman*, 300 F.3d 256, 271 (2d Cir. 2002).

Collateral estoppel can apply to administrative agency determinations which are "quasi-judicial in nature." *ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 226 (2011) (citation omitted). An administrative agency determination is quasi-judicial in nature when "it is rendered pursuant to the adjudicatory authority of an agency to decide cases brought before its tribunals employing procedures substantially similar to those used in a court of law." *Id.* (citation and internal quotation markets omitted); *see also Jeffreys v. Griffin*, 1 N.Y.3d 34, 40–41 (2003) (noting that the relevant factors are "whether the procedures used" were "sufficient both quantitatively and qualitatively, so as to permit confidence that the facts asserted were adequately tested, and that the issue was fully aired").

Here, the Justice Center—a New York state agency—issued a "Report of Investigation Determination" indicating the "outcome of [its] investigation" into the allegations against Plaintiff. (Dkt. No. 76-12, at 2). The Justice Center found the allegations of sexual abuse and neglect "substantiated." (*Id.*). New York regulations define a substantiated report, in relevant part, as "a report of abuse or neglect wherein a determination has been made as a result of an investigation that there is a preponderance of the evidence that the alleged act or acts of abuse or neglect occurred [and] that any such act or acts committed by the subject constitute abuse or neglect." 14 N.Y.C.R.R. § 700.3(f). The subject of a substantiated report has the right to a hearing before an administrative law judge ("ALJ") "to determine whether the findings of the report should be amended." *Id.* § 700.6(a); *see also id.* § 700.10 (setting forth the conduct of the hearing before the ALJ, including the right to call witnesses, present relevant evidence, and cross-examine opposing witnesses). Although Plaintiff initially pursued an appeal of the Justice Center's substantiated report against her, she withdrew her appeal the day before her scheduled hearing. (Dkt. No. 86-2, at 4).

The Court concludes that collateral estoppel does not preclude Plaintiff from arguing that she did not sexually abuse a minor on October 17, 2017 because that issue was not "actually litigated" in a quasi-judicial manner before the Justice Center. While the Justice Center's report states that the Justice Center "investigated" the allegations against Plaintiff, the record before the Court does not indicate exactly what that investigation entailed and what procedures were used, much less that procedures substantially similar to those used in a court of law were employed. Defendant testified at her deposition that the Justice Center interviewed her as part of an investigation, while Plaintiff testified that she declined the opportunity to participate in an "interrogation." (Dkt. No. 76-8, at 133–34; Dkt. No. 76-9, at 106–07). The Court therefore cannot conclude that the issue of whether Plaintiff sexually abused a minor was "adequately tested" or "fully aired." *Jeffreys*, 1 N.Y.3d at 40–41. The parties have not cited to, and the Court has not found, any caselaw addressing the issue preclusive effect of a Justice Center's substantiated report which was not appealed. In *Kosakow v. New Rochelle Radiology Associates, P.C.*, however, the Second Circuit held that "a determination of no probable cause by [the New York Division of Human Rights ("DHR")], absent a formal hearing and absent any subsequent review in state court," did not preclude "subsequent federal court litigation of an issue already decided by the DHR." 274 F.3d 706, 730–36 (2d Cir. 2001). There, the plaintiff submitted a complaint to the DHR and the parties exchanged responsive papers with supporting documents, but there was no record of any discovery, interviews of witnesses, or hearing. *Id.* at 734. The Second Circuit could not "ignore[] that the DHR makes factual conclusions based on a record that is far less developed than that before a federal court," and concluded that the plaintiff was not collaterally estopped from relitigating the issue. *Id.* at 735–36. Here, there is no indication that Plaintiff participated in the Justice Center's investigation at all or on what the investigation

was based. Defendant therefore has not met her burden of demonstrating that the same issue was actually litigated in a quasi-judicial forum.

Further, Plaintiff's failure to avail herself of the opportunity to appeal the Justice Center's report does not give the Justice Center's substantiated report preclusive effect. Although a hearing before the ALJ likely would have involved more formal procedures more akin to those found in a court of law, *see* 14 N.Y.C.R.R. § 700.10, the availability of those procedures does not alter the fact that the issue was not actually litigated or sufficiently fully aired. If an issue "has not been litigated, there is no identity of issues between the present action and the prior determination." *Halyalkar v. Bd. of Regents of N.Y.*, 72 N.Y.2d 261, 267 (1988) (citation omitted). "An issue is not actually litigated if, for example, there has been a default, a confession of liability, a failure to place a matter in issue by proper pleading[,] or even because of a stipulation." *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 456–57 (1985) (citations omitted). In *Halyalkar*, for example, the Court of Appeals held that a consent order in a prior administrative proceeding stating that the plaintiff entered a plea of guilty to disciplinary charges did not have collateral estoppel effect. 72 N.Y.2d at 268. The Court of Appeals noted that, by signing the consent order, the plaintiff "simply indicated" that he did not wish to contest the charges against him and wanted to "accept the minimal sanction" negotiated by his counsel. *Id.* Therefore, the "issue in question was neither argued, nor conceded nor even addressed" in the administrative proceeding. Similarly, here, the Court concludes that Plaintiff's withdrawal of her appeal operates more like a default or an acceptance of the penalty against her. *Kaufman*, 65 N.Y.2d at 456–57; *Halyalkar*, 72 N.Y.2d at 268. While Defendant argues that "a default judgment is conclusive as to the issues which were raised or could have been raised in the prior action," the cases she cites discuss the related but distinct concept of res judicata, not collateral estoppel. (*See*

Dkt. No. 86, at 15–16, and cases cited therein). As the cases cited above state, an issue has not been actually litigated for purposes of collateral estoppel in the event of a default.[16]

Accordingly, the Court concludes that Plaintiff's claims are not barred by the doctrine of collateral estoppel.

### C.      Color of State Law

Defendant argues that she is entitled to summary judgment on Plaintiff's claims because Plaintiff "cannot present evidence" that Defendant was acting under color of state law when she made the allegedly false statements. (Dkt. No. 76-2, at 27–29). Defendant argues that her mere employment by the state and the fact that she was on duty at the time of the incident are not sufficient to make her conduct "fairly attributable" to the state and points to Investigator Mackey's and DA Hubbard's attestations that "they did not see [Defendant's] role as a counselor at the YLA as giving her any authority or additional power." (*See id.* (citing Dkt. No. 76-4, ¶ 26; Dkt. No. 76-5, ¶ 31)). Plaintiff responds that a reasonable jury could find that Defendant acted under color of state law because there is evidence that Defendant made the allegedly false statements about the incident as part of discharging her duties as Administrator-on-Duty. (Dkt. No. 80, at 28–29).

By its terms, Section 1983 applies only where the defendant acts "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983; *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996) ("[A] plaintiff must allege a violation of rights secured by the Constitution or laws of the United States, and that such violation was committed by a person acting under the color of state law."). A

---

[16] The Court does not reach the parties' arguments as to whether Plaintiff had a "full and fair opportunity" to litigate the issue of whether she sexually abused a minor.

"defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49–50 (1988). By contrast, "acts of officers in the ambit of their personal pursuits are plainly excluded." *United States v. Giordano*, 442 F.3d 30, 42–43 (2d Cir. 2006) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion)). "[T]here is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994). A defendant acts under color of state law for the purposes of Section 1983 when she exercises a power "possessed by virtue of state law and made possible only because the wrongdoer is cloaked with the authority of state law." *Colombo v. O'Connell*, 310 F.3d 115, 117–18 (2d Cir. 2002) (citation omitted). The "focus" of the color of law inquiry is on "whether there was an abuse or misuse of a power conferred upon [the state employee] by state authority," and "look[s] to the nature of the officer's act, not simply [her] duty status." *Pitchell*, 13 F.3d at 548–49.

Here, viewing the facts in the light most favorable to Plaintiff, the Court concludes that there is evidence from which a reasonable factfinder could conclude that Defendant acted under color of state law when she made the allegedly false statements regarding the incident. First, as the parties agree, Defendant was the Administrator-on-Duty at the YLA on October 17, and she was in a supervisory position with respect to Plaintiff. While the fact that Defendant was on duty at the time of her challenged conduct is not itself sufficient to establish state action, *Pitchell*, 13 F.3d at 548, a factfinder could conclude from the evidence that her actions were "related to the authority conferred upon [her] by the state," *Arroyo v. City of Bridgeport*, No. 12-cv-1258, 2015 WL 235065, at *8, 2015 U.S. Dist. LEXIS 5408, at *22 (D. Conn. Jan. 16, 2015) (citations omitted). Defendant agreed at her deposition that, as part of her role as supervisor in charge of the YLA facility on October 17, it was her responsibility "to report anything that [she] may have

observed" through the chain of command. (Dkt. No. 76-8, at 94–95). She also stated that her responsibility to report something she observed that was possibly criminal in nature to the police would depend on whether the director or assistant director told her to report it. (*Id.* at 95–97; *see id.* at 98–99 (agreeing that "the calls to the Justice Center and to the police were things that naturally flowed from [Defendant] following [her] obligations and [her] responsibilities as [Administrator-on-Duty] to report through the chain of command")).[17] Defendant reported her observations of the incident, either directly or indirectly, to her superiors, the Justice Center, and the police. A factfinder could conclude that her statements to police were performed as "a means of carrying out the responsibilities of [her] official position" as Administrator-on-Duty. *See, e.g.*, *Defalco v. MTA Bus Co.*, 788 F. App'x 43, 45 (2d Cir. 2019) (summary order) (concluding that state employee acted under color of state law where his involvement in the conduct at issue "arose directly from his position as an MTA Bus Company foreman"). If a jury were to so conclude, the fact that any private citizen could have engaged in the same conduct, (*see* Dkt. No. 76-2, at 28), is irrelevant. *Cf. Defalco*, 788 F. App'x at 45 ("[I]f an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity." (citation omitted)).

Defendant also argues that Plaintiff cannot present any evidence that she acted under color of state law because Investigator Mackey and DA Hubbard have "affirmed that she did not use her position" during the investigation and prosecution. (Dkt. No. 79-2, at 29). Investigator Mackey states that he found Defendant credible, but that her "position as a youth counselor or as

---

[17] Notably, Defendant argues elsewhere that Plaintiff's claims fail because she is a mandatory reporter and was obligated to report what she saw under penalty of state liability. Such an obligation arises only by virtue of Defendant's employment.

Administrator-on-Duty at the YLA did not influence [his] opinion of her." (Dkt. No. 76-5, ¶ 31). Similarly, DA Hubbard states that Defendant's position did not influence his judgment of her credibility, that Defendant "did not attempt to assert additional authority based on her position," and that she was "simply a fact witness to the incident." (Dkt. No. 76-4, ¶ 26). However, this argument "erroneously centers on [Investigator Mackey's and DA Hubbard's] subjective reaction[s] to [Defendant's] conduct rather than the nature of [Defendant's] activity" and therefore "misses the essence of the color of law requirement." *Pitchell*, 13 F.3d at 548–49 (rejecting the plaintiff's argument that the defendants acted under color of state law because the "'police presence' in the apartment had a numbing effect on his defenses" and he "believed he would be protected"). Because the focus of the color of state law requirement is on the nature of Defendant's conduct, and not any particular individual's subjective perception of that conduct, Defendant's argument is misplaced.

Accordingly, the Court concludes that there is a triable issue of fact as to whether Defendant acted under color of state law, and Defendant is not entitled to summary judgment on this element of Plaintiff's claims.[18]

### D.    Initiation

Defendant argues that she is entitled to summary judgment on Plaintiff's claims because there is not evidence that she initiated either Plaintiff's arrest or prosecution. (Dkt. No. 76-2, at 11–17). Plaintiff responds that a reasonable jury could find that Defendant knowingly made false statements to law enforcement, which satisfies the "initiation" element. (Dkt. No. 80, at 14–21).

---

[18] The Court therefore does not address Plaintiff's alternative argument that Defendant was "jointly engaged with state officials." (Dkt. No. 80, at 29).

To establish the first element of a false arrest claim—that Defendant intended to confine Plaintiff—the defendant "must have either: (1) confined or intended to confine [the] plaintiff[], or (2) affirmatively procured or instigated the plaintiff's arrest." *King v. Crossland Sav. Bank*, 111 F.3d 251, 256 (2d Cir. 1997). A "civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest." *Du Chateau v. Metro-N. Commuter R.R. Co.*, 253 A.D.2d 128, 131 (1st Dep't 1999). On the other hand, "a complainant can be held liable for false arrest if the complainant 'intentionally provided false information' to instigate an arrest by law-enforcement officials, or had no reasonable basis for the report." *Biswas v. City of New York*, 973 F. Supp. 2d 504, 519 (S.D.N.Y. 2013) (quoting *Brown v. Nassau Cty.*, 306 A.D.2d 303, 303 (2d Dep't 2003)); *see also Grant v. City of New York*, No. 15-cv-3635, 2019 WL 1099945, at *7, 2019 U.S. Dist. LEXIS 37791, at *18 (E.D.N.Y. Mar. 8, 2019) (noting that, to be liable for false arrest, an individual defendant must have "proximately caused the unlawful arrest" (citations omitted)).

Similarly, the "[i]nitiation" of a criminal proceeding in the context of a malicious prosecution claim "is a term of art." *Rohman*, 215 F.3d at 217. The "mere reporting of a crime to police and giving testimony are insufficient; it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Id.* (quoting *DeFilippo v. Cty. of Nassau*, 183 A.D.2d 695, 696 (2d Dep't 1992)). "Giving information to the police that is known to be false qualifies as the commencement of a prosecution." *Rivers v. Towers, Perrin, Forster & Crosby Inc.*, No. 07-cv-5441, 2009 WL 817852, at *3, 2009 U.S. Dist. LEXIS 26301, at *7 (E.D.N.Y. Mar. 27, 2009); *see also Wong v. Yoo*, 649 F. Supp. 2d 34, 65 (E.D.N.Y. 2009) ("[W]here a party is responsible for providing false

information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution." (quoting *Chimurenga v. City of New York,* 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999))). However, the prosecutor's "exercise of independent judgment" in initiating a criminal prosecution may break the chain of causation between the defendant's allegedly unlawful conduct and the plaintiff's subsequent prosecution. *Bernstein v. City of New York*, No. 06-cv-895, 2007 WL 1573910, at *6, 2007 U.S. Dist. LEXIS 39286, at *20–21 (S.D.N.Y. May 24, 2007) (citation omitted).

Defendant argues that she is entitled to summary judgment because she "did not initiate any contact with any law enforcement officers"; she "offered no advice, direction, or encouragement" in the investigative or prosecutorial process; and Investigator Mackey and DA Hubbard both "affirmed that their decisions to move forward with the arrest and the indictment were based on their professional judgment, alone" and were not based solely on Defendant's statements. (Dkt. No. 76-2, at 15–16). Therefore, because law enforcement acted "independently," Defendant argues she cannot be held liable. (*Id.* at 17). In response, Plaintiff argues that (1) "knowingly and intentionally provid[ing] false and/or misleading information to the police and/or prosecutors for the purpose of procuring the plaintiff's arrest or prosecution" satisfies the "initiation" prong; (2) there is a question of fact as to who called the police on October 17, 2017; and (3) Investigator Mackey's and DA Hubbard's affirmations that they acted on their own professional judgment are "belied by the record." (Dkt. No. 80 at 15–21). The Court first proceeds to consider whether a reasonable jury could find that Defendant knowingly provided false information to law enforcement.

### 1.     Statement #1: Plaintiff said she was teaching J.C. "how to clean the toilet."

The first false statement Plaintiff claims Defendant made is that, when Defendant asked what Plaintiff and J.C. were doing in the bathroom stall, Plaintiff responded: "I was teaching him how to clean the toilet." (Dkt. No. 76-10, at 2). Plaintiff says that Defendant omitted Plaintiff's complete statement—"I was trying to show him how to clean the bathrooms *when he came up behind me*." (Dkt. No. 76-9, at 145 (emphasis added)). It appears that there is no dispute that Plaintiff said, at some point while Defendant was in the Activity Room 4 bathrooms, that she was trying to show J.C. how to clean the bathrooms. (*See* Dkt. No. 76-9 at 145 (Plaintiff's testimony that she remembers saying "I was trying to show him how to clean the bathrooms"); (Dkt. No. 76-10, at 5 (G.H.'s statement in his supporting deposition that he heard Plaintiff "try to tell [Defendant] she was only showing [J.C.] how to clean the toilet"). However, viewing the evidence in the light most favorable to Plaintiff, and in combination with the alleged failure to report that Plaintiff asked for help, discussed below, Defendant's statement could be found to be false or materially incomplete to the extent she did not report that Plaintiff said that J.C. "came up behind [her]."

### 2.     Statements #2 & 3: J.C.'s Statements to Defendant

Plaintiff claims that Defendant falsely reported in her supporting deposition that J.C. told Defendant that (1) he "finger popped" Plaintiff and "stuck [his] dick in her two or three times before you came in" and (2) Plaintiff "coerced him to have sex." (*See* Dkt. No. 76-10, at 2). Defendant argues that Plaintiff cannot present any evidence that these statements were false, noting that J.C.'s interview with police corroborates Defendant's report and that Plaintiff, who was not witness to any conversation between J.C. and Defendant, does not know what J.C. said to her. (Dkt. No. 76-2, at 20). Plaintiff responds that J.C.'s interview in which he used the term

"finger popped" did not occur until 3:40 a.m., after Defendant gave her statement and accompanied J.C. to the emergency room; that his original supporting deposition merely says that J.C. and Plaintiff "began to have sex" in the bathroom stall; and that there is evidence that J.C. did not make any statement about "finger popping" while in the bathroom. (Dkt. No. 80, at 23).[19]

During her deposition, when Defendant was asked whether she had described "every single thing" she recalled having been said by Plaintiff and J.C in the bathroom, Defendant stated that she had recounted what she "can remember," but she did not mention any statement by J.C. regarding "finger popping," his penis, or having been coerced. (*See* Dkt. No. 76-8, at 84–87). Plaintiff, on the other hand, testified that she did not hear J.C. say that he "finger popped" her or "stuck his dick" in her. (Dkt. No. 76-9, at 129; *see also id.* at 87–90). While Defendant's supporting deposition to the police does not specifically indicate that J.C. made these statements to her while they were in the bathroom, (*see* Dkt. No. 76-10, at 2), Defendant did testify that she had no had further contact with J.C. after leaving the bathroom and before giving her statement to police shortly after 11:00 p.m., (Dkt. No. 76-8, at 111). Viewing all of this evidence in the light most favorable to Plaintiff, therefore, a reasonable jury could find that J.C. made no such statements to Defendant before Defendant provided her supporting deposition to the police.

### 3.     Statement #4: Failing to Report that Plaintiff Asked for Help

Finally, Plaintiff claims that Defendant failed to report that Plaintiff asked for her help. Defendant argues that the evidence shows that Plaintiff did not ask Defendant for help, citing to Defendant's own testimony and Plaintiff's criminal trial testimony that she did not tell Defendant

---

[19] Plaintiff argues that the "sequence of events," with Defendant's giving these statements at 11:33 p.m. while J.C. did not make similar comments until his 3:40 a.m. interview and after Defendant had transported him to the hospital, "suggests [Defendant] coached J.C. so that their statements would match." (Dkt. No. 80, at 23).

that she was forced into the bathroom, that she was scared of the residents, or "anything about what happened." (Dkt. No. 76-2, at 20–21; Dkt. No. 76-14, at 156–57). Plaintiff notes that she "unequivocally testified at her deposition" that she told Defendant "help" and "he is attacking me," and that the "apparent inconsistency" in her testimony is an issue of credibility for the jury. (Dkt. No. 80, at 24 (citing Dkt. No. 76-9, at 87)).[20]

While Plaintiff has given contradictory testimony on this point, it is not the Court's job at this stage to assess the credibility of the parties. *Jeffreys*, 426 F.3d at 553–54 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)). Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that a jury could find that Plaintiff did ask Defendant for help and indicate that J.C. had assaulted her, including by virtue of her statement that J.C. "came up behind" her. If such were the case, the jury could also conclude that Defendant knowingly reported false information to law enforcement. *Cf. Weintraub v. Bd. of Educ. of City of N.Y.*, 423 F. Supp. 2d 38, 56 (E.D.N.Y. 2006) (denying summary judgment on false arrest claim where the "truth of what actually occurred" between the parties was disputed and where, "[i]f a jury were to believe [the plaintiff's] account, rather than [the defendant's], it would reasonably infer that [the defendant] knew [the plaintiff] had not assaulted her, but nonetheless intended to have him arrested by making false statements to the police"); *see also Biswas*, 973 F.

---

[20] Defendant argues that Plaintiff may not defeat summary judgment by submitting an affidavit that contradicts her prior sworn testimony. (Dkt. No. 86, at 6–8). The Court concludes that the "sham issue of fact" doctrine is not applicable here. *See Chichinadze v. BG Bar Inc.*, 517 F. Supp. 3d 240, 248 (S.D.N.Y. 2021) (summarizing the doctrine). While Plaintiff's newly submitted declaration contradicts her criminal trial testimony, it is consistent with her deposition testimony. (*See* Dkt. No. 80-6, ¶ 15 ("I followed Copeland toward the door, begging her not to leave and asking for help, indicating again that[] J.C. had pushed me into the stall and attacked me."); Dkt. No. 76-9, at 87 (testifying at deposition that she said "help" and "he is attacking me")). The declaration therefore does not raise a factual issue "only after discovery is closed and in response to the other side's motion for summary judgment." *Savarese v. City of New York*, 547 F. Supp. 3d 305, 328 (S.D.N.Y. 2021) (citing *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000)).

Supp. 2d at 519–20 (denying motion to dismiss false arrest claim where the plaintiff alleged that defendants caused the plaintiff's arrest while knowing that she was "actually innocent").

Accordingly, considering all of Defendant's statements together, the Court concludes that there is a triable issue of fact as to whether Defendant knowingly provided false or materially incomplete information to law enforcement.

### 4.    Causation

The parties dispute whether the information Defendant provided to law enforcement affected the decision to arrest or prosecute Plaintiff. *See Vlach v. Staiano*, 604 F. App'x 77, 78–79 (2d Cir. 2015) (summary order) (affirming grant of summary judgment to defendant on false arrest claim where, "even if [the defendant] provided materially incomplete information to the State Police," the police "undertook their own investigation" and independently arrested the plaintiff); *Hill v. City of New York*, No. 05-cv-9473, 2007 WL 4592000, at *4, 2007 U.S. Dist. LEXIS 94969, at *10 (S.D.N.Y. Dec. 28, 2007) (finding the initiation element not satisfied where the plaintiff did not show that the defendants "misled or pressured" the prosecutor, the prosecutor's actions were "independent" and "discretionary," and the prosecutor's "intervening decision to pursue a criminal charge" broke the chain of causation). However, even assuming there is a triable issue of fact as to whether the allegedly false or materially incomplete information Defendant provided to law enforcement proximately caused the decisions to arrest and prosecute Plaintiff, as discussed in the next section, Plaintiff has failed to raise a material issue of fact as to probable cause.

### E.    Independent Probable Cause

Defendant argues that she is entitled to summary judgment on both of Plaintiff's claims because the police and the prosecutor had probable cause—which is a complete defense to the claims of false arrest and malicious prosecution—to arrest and prosecute Plaintiff. (Dkt. No. 76-

2, at 23–26). Defendant argues that Plaintiff cannot rebut the presumption of probable cause created by a grand jury indictment and that there was "ample probable cause created by the evidence" other than Defendant's allegedly false and materially incomplete statements. (*Id.*). Plaintiff responds that a reasonable jury could find that Investigator Mackey "would have objectively lacked reasonable cause to arrest" Plaintiff if Defendant "had told the truth" and that Defendant's false reports to authorities "undermined the prosecutorial process, thereby rebutting the presumption of probable cause" created by the indictment. (Dkt. No. 80, at 25–27).

The Court notes at the outset that, while the existence of probable cause is a complete defense to both of Plaintiff's claims, the parties' arguments do not meaningful distinguish between probable cause to arrest and probable cause to prosecute. These are two distinct inquiries, *Li v. City of New York*, 246 F. Supp. 3d 578, 611 (E.D.N.Y. 2017), and the presumption of probable cause that arises after indictment by a grand jury is only that of probable cause to prosecute, *see Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 636 (S.D.N.Y. 2015) (noting that "the probable cause presumption arising from a grand jury indictment does not apply to a false arrest action"). The Court therefore addresses probable cause as to each of Plaintiff's claims separately.

### 1.    Arrest

Probable cause to arrest exists when "one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014). The inquiry focuses on the "facts known by the arresting officer at the time of the arrest" and whether those facts "objectively provided probable cause to arrest." *Ackerson v. City of White Plains*, 702 F.3d 15, 19–20 (2d Cir. 2012) (citation omitted). A defendant will prevail if there was probable cause to arrest the plaintiff "for

any single offense," regardless of the charge actually invoked by the arresting officer. *Id.* at 20 (citations omitted).

Here, the undisputed record evidence shows that the State Police had probable cause to arrest Plaintiff based on the facts and circumstances known to them at the time of Plaintiff's arrest independent of Defendant's allegedly false statements. Although Plaintiff argues that Investigator Mackey's declaration asserts that the decision to arrest her was "based on several purported facts of which he was not actually aware at the time she was arrested," she cites to portions of his declaration which clearly relate to the investigation *following* her arrest. (Dkt. No. 80, at 18–19 (citing, *e.g.*, Dkt. No. 76-5, ¶¶ 13, 18–19, 30)). It is undisputed that State Police responded to the YLA; interviewed at least Defendant, J.C., and G.H.; and reviewed surveillance video footage before arresting Plaintiff. (Dkt. No. 76-5, ¶¶ 5–12; Dkt. No. 76-10, at 2, 3, 5). Based on these interviews, and excluding Defendant's allegedly false or materially incomplete statements, the State Police knew, at a minimum, that (1) Defendant had found Plaintiff and J.C. in a bathroom stall in a sexual situation;[21] (2) J.C. and G.H. gave similar descriptions of the incident and both reported that J.C. and Plaintiff also had a prior sexual encounter the night before; and (3) J.C. reported that he and Plaintiff "began to have sex" in the bathroom stall. (*See* Dkt. No. 76-5, ¶¶ 6–11; Dkt. No. 76-10, at 2, 3, 5). Given the ages of Plaintiff and J.C., these facts and circumstances are objectively "sufficient to warrant a person of reasonable caution in the belief" that Plaintiff had committed an offense. *Betts*, 751 F.3d at 82; *see* N.Y. Penal Law § 130.25(2) ("A person is guilty of rape in the third degree when . . . [b]eing twenty-one years old or more, he or she engages in sexual intercourse with another person less than seventeen

---

[21] (*See also* Dkt. No. 76-9, at 141–42 (Plaintiff acknowledging at her deposition that Defendant "saw [her] in the bathroom stall with J.C. with his pants down and with [her] pants down" and that Defendant was obligated to "report that")).

years old."); *Alexander v. City of Syracuse*, No. 17-cv-1195, 2021 WL 5628726, at \*14, 2021 U.S. Dist. LEXIS 229639, at \*39 (N.D.N.Y. Dec. 1, 2021) (noting that "a victim's complaint alone is often enough to establish probable cause" to arrest).

Plaintiff disputes Investigator Mackey's statement that the police interviewed her at the YLA and that she "gave very little information" and "did not claim she was being sexually assaulted." (*See* Dkt. No. 76-5, ¶ 8). According to Plaintiff, she was not interviewed at the YLA. (Dkt. No. 80-6, ¶ 23(f)). However, this dispute of fact does not preclude summary judgment. Even accepting Plaintiff's statement that she was not interviewed at the YLA, it remains undisputed that the police were aware of the above facts and circumstances at the time of her arrest, and it is undisputed that Plaintiff did not tell law enforcement that J.C. had assaulted her prior to her arrest. (*See* Dkt. No. 80-6, ¶ 17). Plaintiff also disputes what information was known to Investigator Mackey at the time he interviewed her at the barracks, and specifically whether he had reviewed the surveillance footage. (Dkt. No. 80, at 18).[22] At the criminal trial, in response to a question regarding evidence that he had when he interviewed Plaintiff at the barracks—by which time she had already been arrested—Investigator Mackey stated that he had "depositions." (Dkt. No. 80-4, at 5–6). This is not necessarily inconsistent with his statement that the police who responded to the YLA "review[ed] security footage" and "reported their findings" to him before he instructed them to arrest Plaintiff. (Dkt. No. 76-5, ¶¶ 11–12). The surveillance video generally corroborates the accounts of Defendant, J.C., and G.H., and at the very least is not inconsistent with those reports. (Dkt. No. 76-13). Accordingly, the Court concludes that probable cause existed to arrest Plaintiff.

---

[22] Contrary to Plaintiff's argument, Investigator Mackey's declaration does not state that he relied on any physical evidence in deciding to arrest Plaintiff.

Finally, Plaintiff argues that the police would not have had probable cause to arrest her if Defendant "had told the truth." (Dkt. No. 80, at 25, 27). As discussed, however, probable cause existed even in the absence of the allegedly false or materially incomplete information: the police had probable cause to arrest Plaintiff even if Defendant had reported that Plaintiff asked for help given J.C.'s report that he and Plaintiff "began to have sex" and other corroborating evidence.

Accordingly, because probable cause existed for Plaintiff's arrest, Defendant is entitled to summary judgment on Plaintiff's false arrest claim.

### 2.    Prosecution

Probable cause to prosecute consists of "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). Probable cause to prosecute is "evaluated in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest." *Li*, 246 F. Supp. 3d at 611 (citation and internal quotation markets omitted). An indictment by a grand jury creates a presumption of probable cause to prosecute. *Boyd*, 336 F.3d at 76. This presumption of probable cause is rebuttable only by a showing that "the indictment was produced by fraud, perjury, the suppression of evidence[,] or other police conduct undertaken in bad faith." *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983)). Thus, "unless the plaintiff can demonstrate that the proceedings before the grand jury were tainted, an indictment extinguishes the [malicious prosecution] claim." *Id.* at 290. Where the plaintiff's only evidence to rebut the presumption of probable cause is her own version of events, courts find such evidence "to be nothing more than mere conjecture and surmise that the plaintiff's indictment was procured as a result of conduct undertaken by the defendants in bad faith." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 273 (S.D.N.Y. 2010) (citation, internal quotation marks, and brackets omitted); *see id.* (explaining that the

Second Circuit has set forth a "competing testimony plus" standard to rebut the presumption requiring a plaintiff to adduce evidence corroborating her own version of events (citing *Boyd*, 336 F.3d at 77)).

Here, Plaintiff has not adduced evidence to rebut the presumption of probable cause for her prosecution which was created by the grand jury indictment. While the entirety of the grand jury transcript and presentation is not before the Court, Defendant's testimony is. (Dkt. No. 80-3, at 9–30). Plaintiff argues that a reasonable jury could find that Defendant's "knowingly false reports to the authorities" "undermined the prosecutorial process, thereby rebutting the presumption of probable cause erected by the Grand Jury indictment," (Dkt. No. 80, at 26), but she does not explain how the proceedings before the grand jury were "tainted," *Rothstein*, 373 F.3d at 290. Notably, Defendant did not repeat the three allegedly false statements from her supporting deposition before the grand jury, and Plaintiff herself testified before the grand jury. (*See* Dkt. No. 80-3, at 3, 9–30).

To the extent Plaintiff argues that Defendant failed to report to the grand jury that Plaintiff pleaded for help, that fact is insufficient to rebut the presumption of probable cause. First, under the "competing testimony plus" standard, Plaintiff has pointed to no evidence corroborating her own testimony that she did ask Defendant for help on October 17. *Cf. Peterson v. Regina*, 935 F. Supp. 2d 628, 643 (S.D.N.Y. 2013) (granting summary judgment on malicious prosecution claim where the plaintiff did not present any "competing testimony plus" and therefore did not rebut the presumption of probable cause). Second, even assuming that Defendant failed to report Plaintiff's pleas for help, and that she did so in bad faith, there is no evidence from which a reasonable factfinder could conclude that probable cause to prosecute would not have existed even in the absence of this omission. *See De Lourdes Torres v. Jones*, 26

N.Y.3d 742, 762 (2016) (noting that a plaintiff may show malice and rebut the presumption of probable cause "with proof that the defendant falsified evidence in bad faith and that, *without the falsified evidence*, the authorities' suspicion of the plaintiff would not have fully ripened into probable cause" (emphasis added)). The record reflects that, in addition to Defendant, the grand jury heard testimony from J.C., Mr. Baker, Director Smith, Investigator Mackey, and Plaintiff herself, although the bulk of that testimony is not in the record. (Dkt. No. 80-3, at 3). Plaintiff has not pointed to evidence which would rebut the presumption of probable cause for her prosecution or "erode the premise that the Grand Jury acts judicially." *Cf. Rothstein*, 373 F.3d at 284–85 (directing entry of judgment for defendant where plaintiff had "no idea what happened before the grand jury").

Accordingly, because Plaintiff has not presented evidence to rebut the presumption of probable cause for her prosecution, Defendant is entitled to summary judgment on Plaintiff's malicious prosecution claim.[23]

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 76) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Fourth Amendment claims for false arrest and malicious prosecution are dismissed with prejudice; and it is further

---

[23] Because Defendant is entitled to summary judgment on Plaintiff's malicious prosecution claim, the Court need not consider the parties' arguments regarding malice.

Plaintiff requests that the Court read a state-law malicious prosecution claim into her complaint. (Dkt. No. 80, at 29 n.5). However, even if the Court were to consider this request, a state-law malicious prosecution claim would fail for the same reasons Plaintiff's Section 1983 malicious prosecution claim fails. *See supra* Section IV.E; *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (noting that, to prevail on a Section 1983 malicious prosecution claim, a plaintiff must, inter alia, "establish the elements of a malicious prosecution claim under state law," including "lack of probable cause for commencing the proceeding").

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated:  <u>August 9, 2022</u>
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge